UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MCDONALD LUMBER COMPANY, INC.,

    Plaintiff,

    v.                                              Case No. 06-C-770

CITICAPITAL TRAILER RENTAL, INC.,

    Defendant.

---

## DECISION AND ORDER

---

      This case arises out of a lease agreement between Citicapital Trailer Rental, Inc. ("Citicapital") and McDonald Lumber Company, Inc. ("McDonald"). The agreement called for McDonald to lease land to Citicapital and construct a building facility for Citicapital's use. The lease set forth an initial term of three years with an option to renew. The lease also called for a penalty payment should Citicapital terminate the agreement at any time after the first three years. When Citicapital wrote McDonald expressing its intention to terminate (or not renew) the lease upon the end of the initial three-year term, McDonald demanded that Citicapital abide by the lease's "termination" penalty and provide 90 days notice. Citicapital refused to pay both rent beyond the initial term and the termination penalty, arguing that the lease was simply expiring of its own accord. McDonald brought this action against Citicapital seeking the balance of rent and utilities due, the termination penalty, and real estate assessments. Both parties have moved for summary judgment. For the following reasons, McDonald's motion will be denied and Citicapital's motion will be granted.

**I. Background**

In 2000, McDonald Lumber and Associates Rental Systems, Inc. entered into a month-to-month Lease with McDonald for approximately 3.37 acres in the City of Green Bay. The lease commenced August 1, 2000, with a mutual right of cancellation upon 30-days written notice. Rent was $750.00 per month, and the Lessee was also required to pay a proportionate share of real estate taxes in consideration for use of the property solely for leasing and storage of trailers.

Citicapital acquired Associates Rental Systems and began negotiations for a new lease with Michael A. McDonald, since deceased. In addition to leasing the land, Citicapital wanted McDonald to construct a small building to house an office on the lot. McDonald was willing to construct the building, with the cost to be amortized over the term of the loan. The parties intended that when Citicapital vacated the lot the landlord would still own the building.

McDonald originally wanted the lease to extend for ten years in order to ensure that his costs stuck into the building could be recovered. (Axe Decl., Ex. A at 49:7-19.) Subsequent negotiations, however, reduced the term to five, and finally, three years. The term of the lease was to commence on the first day of August, 2002, and continue for three years, "terminating July 31, 2005." (Lease ¶ 3.)[1] The word "August" was crossed out by hand and the parties, by addendum, changed the terms of ¶ 3 to read as follows: "TERM. The term of this Lease shall commence on the first day of February, 2003, and shall continue for three (3) years, terminating on the 31st day of January, 2006." Citicapital was obligated to pay monthly rent of $3,677.50 in addition to real estate taxes, utilities, and insurance.

---

[1]The lease is found at exhibit 3 to the declaration of Kenneth Axe and is cited to herein simply as "Lease".

On January 6, 2006, Glen Forshee, Citigroup Asset Manager, called Chet McDonald of McDonald Lumber and stated that Citicapital would be "terminating the Lease" for the property. (Citicapital PFOF ¶ 43.) McDonald Lumber asked for and received written notice on January 12, 2006. McDonald responded by letter dated January 13, 2006, stating the lease required a 90-day notice of termination of the lease and that therefore the lease would terminate April 30, 2006. (Citicapital PFOF ¶ 48.) The letter further cited paragraph 4 of lease – the key paragraph at issue here – which provides:

> Lessor and Lessee hereby agree that Lessee shall have the right to terminate this Lease at any time after the third (3rd) year of the original lease term, by providing Lessor ninety (90) days prior written notice. In the event Lessee elects to terminate, Lessee shall pay to Lessor as a penalty payment the amount set forth on Exhibit "B" attached hereto, corresponding to the year in which Lessee exercises its termination right as set forth herein. For example, if Lessee terminates the Lease as of the expiration of the third year of the term, the penalty payment shall be $58, 419.11.

McDonald wrote that "the penalty payment for an April, 30, 2006 termination would be $56,783.90, payable on termination." (Depo. Exh. 6.) McDonald calculated the payment figure according to Exhibit B to the lease, as set forth in paragraph 4 regarding "penalty payment[s]."

In addition to the penalty payment, the letter stated that Citicapital must pay $6,435.00 as its portion of the special assessment and $2,403.78 in past due water utilities. (Axe Decl., Ex. 6.) McDonald also sent invoices for February, March and April 2006 rent, with an increase for "annual adjustment starting in February. (Axe Decl., Ex. 8, 9, 12.)

Citicapital responded to McDonald by letter dated June 13, 2006, stating that the lease had expired by its own terms on January 31, 2006, and that because Citicapital had made all rent payments to that point it did not have any further obligations to McDonald. (Axe Decl., Ex. 10.) Citicapital did make a payment subsequent to January 31, 2006, in the amount of $3,965.95. The

3

payment was applied to what McDonald claimed was owed rent for the month of February. Citicapital now asserts the payment was in error but in the least covers the $75.12 owed for February, 2005.

As it now stands, McDonald seeks $100,615.42, which includes the termination penalty, interest, rents and certain attorney's fees. McDonald moved for summary judgment asserting that the Citicapital failed to comply with the terms of the contract, specifically the penalty provision. Citicapital also moved for summary judgment: it denies any obligations owed to McDonald on the grounds that the lease terminated according to its terms. Additionally, it argues the penalty payment amounts to liquidated damages or unjust enrichment.

## II. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id*. at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend it case. *Id*. at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id*. at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential

element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III. Analysis**

Naturally, the primary goal of contract interpretation is to discover the intention of the parties. *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 456 N.W.2d 359, 362 (1990). When ascertaining the intention, contract terms should be given their plain and ordinary meanings. *Huml v. Vlazny*, 716 N.W.2d 807, 820 (2006). Specific language should not be read in isolation but rather the contract should be read as a whole. *Seitzinger v. Community Health Network*, 676 N.W.2d, 426, 444 (2004).

Because it is a crucial paragraph, it may be helpful at this point to restate the termination clause in its entirety:

> Lessor and Lessee hereby agree that Lessee shall have the right to terminate this Lease at any time after the third (3rd) year of the original lease term, by providing Lessor ninety (90) days prior written notice. In the event Lessee elects to terminate, Lessee shall pay to Lessor as a penalty payment the amount set forth on Exhibit "B" attached hereto, corresponding to the year in which Lessee exercises its termination right as set forth herein. For example, if Lessee terminates the Lease as of the expiration of the third year of the term, the penalty payment shall be $58,419.11.

(Lease, ¶ 4.)

As both sides appear to recognize, the difficulty in interpreting this provision arises in attempting to reconcile the notion of imposing a "termination" penalty when the contract seemingly

5

terminates of its own accord. Put starkly, when a three-year lease expires, is there any lease left to "terminate"?

McDonald appears unphased by this metaphysical conundrum and relies on the fact that the example contained in paragraph 4 of the lease seems to reflect exactly what happened here: "if Lessee terminates the Lease at the expiration of the third year of the term, the penalty payment shall be $58,419.11." (*Id.*) Because the lease was in fact "terminated" at the end of the third year of the term, it is true that this clause ostensibly requires a penalty, but several reasons compel the opposite result.

**1. The clause at issue appears to be a result of drafting error**

First, it seems obvious that this provision was simply a drafting error, and some examination of the lease's negotiation may explain why the clause reads like it does. As noted earlier, the history of the parties' negotiations demonstrates that the term was originally proposed to last ten years, and then five years, but ultimately the parties could only agree on a term of three years. (DPFOF ¶ 11.) This three year term is clearly reflected in the lease, but it seems likely that when the parties amended the term from five to three years they failed to redraft the termination provision to reflect that change. In other words, the termination clause makes sense within the context of a five-year lease, but not within a three-year lease.

Several reasons underlie my conclusion that the clause at issue is simply a drafting oversight. First, the termination provision that appears so awkward in a three-year lease makes perfect sense within a five-year lease. By allowing termination only "at any time after the third (3rd) year of the original lease term," the clause creates a guaranteed term of three years, but builds in a window of flexibility for the lessee to terminate during the fourth or fifth year of the term, albeit with a penalty.

6

This scenario in fact is precisely the purpose an early termination provision is intended to serve – it allows some flexibility to a lessee in a longer contract while affording the lessor the certainty that he will be able to recoup some of his expected revenues if the lease is terminated before its term expires. Without this flexibility window, a termination clause makes no sense – why penalize a lessee for allowing the lease to expire on its expiration date, and why compensate the lessor for the occurrence of an event the lease itself contemplated?

A second reason suggesting that the termination clause is simply a drafting error is that some of the language it uses appears superfluous, or at least unusual, if the clause were drafted with a three-year lease term in mind. As noted, the clause provides that termination may occur after the "third year of the original lease term." The clause continues, "[i]f Lessee terminates the Lease as of the expiration of the third year of the term, the penalty payment shall be $58,419.11." The clause's use of the phrase "the third year of the term" suggests that the intended term was something *other* than three years. That is, if the lease's entire term were *already* defined as three years, one would expect the clause simply to refer to the end of "the term" rather than using the redundant phrase, "the third year of the [three year] term."[2] It makes much more sense to conclude that the lease intended that lessee may terminate "as of the expiration of the third year of the [five year] term."

Finally, I note that the language governing renewal corroborates the fact that the rest of the contract assumed the lease's term was to be five years. Specifically, the renewal clause gives the lessee the right to renew the lease for "one (1) *additional* period of five (5) years." (Lease, ¶ 5.)

---

[2]Similarly, it would be unusual to say that something is due after the "seventh day of a week" instead of simply "a week."
7

By referring to an "additional" five year period, the renewal clause thus implies that the first period was also to be five years. In sum, given the negotiation history between the parties and the considerations noted above, I am persuaded that the termination provision was simply a holdover from an earlier draft of the lease in which the lease's term was five or more years. This disconnect explains why the termination clause would strangely seem to allow "termination" of a lease that has already expired.

**2. The termination clause has no logical application in a three-year lease**

The fact that drafting error may have been involved helps explain why the clause appears so out-of-place, but it does not actually provide guidance as to the result to be reached here. A court must interpret a contract according to its plain terms and may not, by judicial construction, supply language to express what one party may have intended but failed to express. *See Town of Portland v. Wisconsin Elec. Power Co.*, 543 N.W.2d 559, 562 (Wis. App. 1995) ("The Town's failure to require a utility to file a relocation agreement for its underground structures may have been a drafting error but we cannot by judicial construction supply language to express what the Town Board may have intended."). Here, it is clear that the termination clause that may have made sense in the original drafts of a longer-termed lease has no logical application within a lease that lasts three years – the same period after which the termination penalties are triggered.[3] The clause is thus not just unusual – it is inapplicable to the facts of this case. Most importantly, the very nature of any "termination" clause is that it must be an *early* termination clause – such a provision exists in order to allow a contract to end *prior to* – not contemporaneous with – its intended term. Thus, had

---

[3] It is conceivable that the clause could be triggered after a renewal, but that is not at issue here.

8

the parties intended to include a meaningful early termination provision with accompanying penalties, they should have done so within the context of the three-year term the lease provides – for example, they could have amended the termination provision to allow early termination after the second year of the term rather than the third. But as it stands now, the fact that the term's end is contemporaneous with the triggering of the termination clause simply makes no sense. Put another way, termination is an *alternative* to expiration, not the same thing. As such, the clause is inapplicable when the lessee merely allows the lease to expire.

Moreover, McDonald's reading of the lease would undermine several other of its clauses. McDonald does not explain, for example, why the lease would have a three-year "term" at all if an astronomical penalty fee is to be awarded merely for reaching the term's end? And why must Citicapital provide 90 days' notice of something that is already provided for (the term) in the lease itself? Finally, McDonald's reading of the lease ignores the lease's renewal provision. That provision provides that the lessee "may" renew the lease for an additional five-year period. (Lease ¶ 5.) Explicitly described as a "renewal *option*," this clause implies once again that the lease would expire *unless* some affirmative action were taken to renew it; the default is expiration, not renewal. McDonald turns the renewal option on its head by suggesting that the failure to exercise it would result in large penalties.

Finally, I note that Citicapital's notice of termination had the same functional effect as if it had remained silent. Given the fact that the lease was expiring on the same date Citicapital was "terminating" it, Citicapital was under no contractual obligation to provide any notice. The fact that it chose to inform McDonald of that fact does not somehow work against it and create any sort of additional obligations.

9

All of these reasons are just alternate ways of stating the obvious: when a lease terminates by its own terms, as here, there is no lease for the lessee to terminate.[4] The termination clause is actually an "early termination" clause, and by allowing the lease to expire of its own accord, rather than early, Citicapital did not "terminate" the lease early nor incur any early termination penalties. By the same token, Citicapital was not obligated to give 90 days' notice and thus it did not become liable for any additional rents.

For all the foregoing reasons, **IT IS ORDERED** that Citicapital's motion for summary judgment is hereby **GRANTED**; McDonald's motion is **DENIED**; and the case is **DISMISSED**.

Dated this   13th   day of November, 2007.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

---

[4] In so concluding, I am not construing the clause as ambiguous. Instead, I am concluding that the clause is inapplicable because it does not apply when the lease is allowed to expire at the end of its term.

10